UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 17-CR-10113-ADB |
| | ) | |
| PEDRO MEJIA SALAZAR | ) | |
| | ) | |

## **DEFENDANT'S EXPEDITED MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. §3582(c)(1)(A)**

Defendant, Pedro Mejia Salazar, respectfully moves this Court for an order reducing his sentence to time served based on "extraordinary and compelling reasons" pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). COVID-19 is an unprecedented and rapidly expanding global health emergency that presents a particularly serious risk to vulnerable people, such as Mr. Salazar, a 76-year-old man with well-documented and serious co-morbid medical conditions. Specifically, Mr. Salazar suffers from diabetes, asthma, and has a history of renal cancer, which has resulted in the removal of one of his kidneys. Consequently, he is a medically fragile prisoner who is incredibly vulnerable to not only contracting COVID-19, but suffering severe illness, complications, and death should he contract COVID-19. Granting this motion will reduce Mr. Salazar's sentence by approximately six months. Despite being near the end of his sentence, posing a low security risk, and having significant medical vulnerabilities, the Bureau of Prisons ("BOP") will not release Mr. Salazar. He has exhausted his administrative remedies under § 3582(c)(1)(A)(i), and accordingly respectfully asks this Court to grant his immediate release under 18 U.S.C. § 3582(c)(1)(A). For the reasons described in this motion, a time served sentence is justified by extraordinary and compelling reasons, serves the interests of justice, and is consistent with the 18 U.S.C. § 3553(a) factors and the Sentencing Commission's policy statements.

## BACKGROUND

On May 4, 2017, Mr. Salazar pleaded guilty to a one-count information charging him with conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). He was sentenced to fifty (50) months in the Bureau of Prisons and three years of supervised release (Dkt. No. 22). Mr. Salazar is currently incarcerated at Moshannon Valley Correctional Institution in Philipsburg, Pennsylvania, a contracted correctional institution operated by a private corporation. His expected release date is November 20, 2020.

Mr. Salazar is a native of Colombia. After learning that he was being targeted for indictment and extradition from Colombia, he engaged in a dialogue with the United States Department of Justice to appear before this Court voluntarily, to waive indictment, and to plead to an information, which he did. As he was paroled into the United States for the purpose of prosecution, upon the conclusion of his sentence he is expected to be deported to Colombia.

## I. Requests for Compassionate Release to the BOP, Medical Conditions, and Imprisonment at Moshannon Valley.

Mr. Salazar – through predecessor counsel – first requested compassionate release to Warden Oddo of Moshannon Valley on April 11, 2019, citing his deteriorating health conditions. *See* Exhibit A. This letter detailed a number of specific conditions, including his history of renal carcinoma, which resulted in the removal of one of his kidneys prior to incarceration, the discovery of a complex cyst on his right kidney in March 2018, and his diagnoses of diabetes, asthma, and hypothyroidism, among others.[1] Mr. Salazar also submitted an inmate request for compassionate release on August 9, 2019. *See* Exhibit B. Warden Oddo denied these requests for compassionate release on August 14, 2019. *Id*.

On April 5, 2020, Mr. Salazar submitted a compassionate release request due to the

---

[1] These conditions are also documented in the Presentence Report at ¶ 76.

2

confluence of factors relative to his chronic illnesses and his particularized risk being a prisoner with the ballooning COVID-19 pandemic. *See* Exhibit B. The warden received the request on April 10, 2020 and denied it on April 14, 2020. *Id*.

Medical records confirm Mr. Salazar's medical conditions, and document his medication regimen, which includes: Flomax (Tamsulosin), a medication used to treat the symptoms of enlarged prostate; Lipitor (Atorvastatin), a medication that lowers cholesterol; Prinivil (Luynopril/Lisinopril), an ACE-inhibitor used to treat high blood pressure and used to protect the kidneys from harm due to diabetes; Synthroid (Levothyroxine), a medication used to treat hypothyroidism; and ProAir (Albuterol), an inhaler used to treat asthma. Medical records from Moshannon Valley, as well as earlier records documenting his conditions and treatment in Colombia, are attached as Exhibit C. Counsel has also requested updated medical records from Moshannon Valley, but has not yet received them.

At Moshannon Valley, Mr. Salazar is housed in a dormitory with 37 bunk beds capable of housing 74 prisoners. Approximately 69-70 people are currently housed in his unit. These 69-70 prisoners all shower, eat, and have recreation time together. They share ten showers, three toilets, and five wall telephones. Recently, the institution began giving prisoners one temporary single-use facemask per week; however, whether prisoners choose to wear them is voluntary. To Mr. Salazar's knowledge, no prisoner at Moshannon has been tested for the novel coronavirus.

## II. Mr. Salazar is at high risk of severe illness and/or death from COVID-19 due to his pre-existing medical conditions and advanced age, per the Centers for Disease Control.

On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[2] As of May 12, 2020, coronavirus SARS-CoV-2 has infected over 4.2 million people

---

[2] World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (March 11, 2020) at https://bit.ly/2W8dwpS.

worldwide, leading to at least 287,000 deaths. In the United States, officials have confirmed 1.35 million positive cases and 80,897 deaths.[3] The virus is highly contagious, and the Centers for Disease Control and Prevention ("CDC") advise that the virus transfers through respiratory droplets when a person coughs, sneezes, or talks. Droplets can land on another person's mouth or nose if they are in close contact (within six feet). It is also possible to catch the virus by touching a surface that has the virus on it and then touching one's mouth, nose, or eyes.[4] The New England Journal of Medicine disturbingly found that the highly contagious virus "can remain viable and infectious in aerosols [i.e. in the air] for hours and on surfaces up to days."[5] Additional studies also suggest that COVID-19 is capable of at least some airborne transmission and that the illness may be spread by air currents in enclosed spaces.[6]

Infection can result in pneumonia, multi-organ failure, and in some cases, death.

---

[3] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard, available at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last accessed May 12, 2020).

[4] *See* CDC, *What You Should Know About COVID-19 to Protect Yourself and Others*, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

[5] Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973

[6] *See* Marthe Fourcade, *Coronavirus Lingers in Air of Crowded Spaces, New Study Finds*, Bloomberg (Apr. 27, 2020) available at https://www.bloomberg.com/news/articles/2020-04-27/coronavirus-lingers-in-air-of-crowded-spaces-new-study-finds; Kenneth Chang, *How Coronavirus Infected Some, but Not All, in a Restaurant*, New York Times (Apr. 20, 2020) https://www.nytimes.com/2020/04/20/health/airflow-coronavirus-restaurants.html. *See also* CDC, *COVID-19 Outbreak Associated with Air Condition in Restaurant, Guangzhou, China, 2020*, Emerging Infectious Diseases (Jul. 2020) available at https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article#comment. Additional papers are being published on the possibility of airborne transmission. *See, e.g.*, Lidia Morawska & Junki Cao, *Airborne Transmission of SARS-CoV-2: The world should face the reality*, Environment International (Apr. 20, 2020) available at https://www.ncbi.nlm.nih.gov/pubmed/32294574.

Hospitalization rates and fatality rates are highest among older adults, like Mr. Salazar.[7] In addition to his age, Mr. Salazar has three conditions that make the prospect of infection with the novel coronavirus particularly dangerous: diabetes, asthma, and the fact that he previously had renal carcinoma and has only one remaining kidney.

Diabetes, particularly when coupled with age and other health conditions, greatly increases the complications from COVID-19. Both the CDC and the American Diabetes Association have recognized that diabetics are at high risk of complications from coronavirus and the coronavirus kills diabetics at "much higher rates" than non-diabetics.[8] Studies of large groups of patients in both China and New York have found that diabetes was one of the most common comorbidities associated with higher risk for both complications and death from COVID-19.[9] Early on in the pandemic, doctors noticed high "mortality rates among persons with

---

[7] CDC, Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019- COVID-NET, 14 States, March 1-30, 2020, Morbidity and Mortality Weekly Report (Apr. 17, 2020) available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_cid=mm6915e3_w ("Hospitalization rates increased with age, with a rate of 0.3 in persons aged 0–4 years, 0.1 in those aged 5–17 years, 2.5 in those aged 18–49 years, 7.4 in those aged 50–64 years, and 13.8 in those aged ≥65 years. Rates were highest among persons aged ≥65 years, ranging from 12.2 in those aged 65–74 years to 17.2 in those aged ≥85 years.").

[8] Centers for Disease Control, Groups at Higher Risk for Severe Illness, https://tinyurl.com/w4yd732. Am. Diabetes Assoc., *How COVID-19 Impacts People with Diabetes*, https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes

[9] Zunyou Wu & Jennifer McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, JAMA (Feb. 24, 2020) available at https://jamanetwork.com/journals/jama/fullarticle/2762130 (finding elevated case fatality rates in patients aged 70-79 years and in patients with diabetes, chronic respiratory disease, and cancer); *see also* Safiya Richardson, et al., *Presenting Characteristics, Comorbidities, and Outcomes among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020) (observing that of the 5700 hospitalized patients in the study, "the most common comorbidities were hypertension (3026; 56.6%), obesity (1737; 41.7%), and diabetes (1808; 33.8%).").

diabetes"[10] and immediately began searching for an explanation; indeed, the Journal of Diabetes

has issued a formal call for articles addressing the link.[11] The research shows that the "most

severe and fatal cases with COVID-19 have occurred in the elderly or in patients with underlying

comorbidities, particularly CVDs, diabetes mellitus, chronic lung and renal disease, hypertension

and cancer."[12] The largest American study to date, published in the Journal of the American

Medical association, shows diabetes, hypertension, and obesity are the "most common

comorbidities" of COVID-19.[13] Dr. Steven Edelman, an endocrinologist at the University of San

Diego starkly summarized the concerns for type 2 diabetes sufferers: "virtually all persons with

type 2 diabetes, regardless of the date of diagnosis, are especially vulnerable to both contracting

COVID-19, and suffering the severe consequences of COVID-19 if they are infected, with rare

---

[10] Dr. Zachary Bloomgarden, *Diabetes and Covid-19*, 12 J. of Diabetes 347, 347–48 (Apr. 2020) (available at: https://bit.ly/34ZsCQW); *see also* A. Hussein, B. Bhowmik, et al, *Covid-19 and Diabetes: Knowledge in Progress*, Diabetes Research & Clinical Practice (Apr. 2020) (available at: https://bit.ly/34Zs4dW) ("Older age, diabetes and other comorbidities are reported as significant predictors of morbidity and mortality.").

[11] *Id.*

[12] A. Hussein, B. Bhowmik, et al, *Covid-19 and Diabetes: Knowledge in Progress*, Diabetes Research & Clinical Practice (Apr. 2020) (available at: https://bit.ly/34Zs4dW). This is no surprise to doctors. "A relationship between diabetes and infection has long been clinically recognized. Infections, particularly influenza and pneumonia, are often common and more serious in older people with type 2 diabetes mellitus (T2DM)"—the same type of diabetes Mr. Salazar suffers from. *See also* Stefan Bornstein, et al., *Endocrine and metabolic link to coronavirus infection*, Nature Reviews: Endocrinology (Apr. 2020) (available at: https://bit.ly/2yHBRZZ) ("Type 2 diabetes mellitus and hypertension are the most common comorbidities in patients with coronavirus infections."). Indeed, diabetes was a significant comorbidity during MERS outbreak in 2012: "Diabetes mellitus and hypertension are recognized risk factors for severe clinical outcomes, including death, associated with Middle East respiratory syndrome coronavirus infection." K. Alanazi, et al., *Diabetes Mellitus, Hypertension, and Death among 32 Patients with MERS-CoV Infection, Saudi Arabia*, J. of Emerging Infectious Disease (Jan. 2020) (available at: https://bit.ly/3bxVhiI).

[13] Safiya Richardson, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, J. Am. Med. Assoc. (Apr. 22, 2020).

exception." *See* Exhibit D, Affidavit of Dr. Edelman and CV.

Asthma is also a condition that places a person at increased risk for serious complications, or even death, if the person contracts COVID-19.[14] "COVID-19 can affect [the] respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[15]

In addition, Mr. Salazar's history of renal carcinoma and the fact that he has only one remaining kidney is a serious cause for concern with respect to COVID-19 and his increased risk for severe complications, illness, and death. Since the pandemic began, it has been widely known that COVID-19 damages the lungs by "inflaming and clogging the tiny air sacs in the lungs, choking off the body's oxygen supply until it shuts down the organs essential for life."[16] Clinicians are now recognizing, however, that the virus may also be causing damage to a variety of other organs, including kidneys.[17] In fact, almost half of those hospitalized with COVID-19 "have blood or protein in their urine, indicating early damage to their kidneys."[18] "Even more alarming" according to Alan Kliger, a nephrologist at the Yale School of Medicine who co-

---

[14] *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html  See also World Health Organization (Feb. 28, 2020), https://www.who.int/publications-detail/report-of-the-who-china-joint-mission-on-coronavirus-disease-2019-(covid-19) at 12 (finding mortality rate of those with COVID-19 and chronic respiratory disease to be 8.0%).

[15] *Id.*

[16] Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewher*e, Washington Post (Apr. 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html

[17] *Id.*

[18] *Id.*

chairs a task force assisting dialysis patients who have COVID-19, "is early data shows that 14 to 30 percent of intensive-care patients in New York and Wuhan, China — birthplace of the pandemic — have lost kidney function and require dialysis, or its in-hospital cousin, continuous renal replacement therapy."[19] Dr. Kliger suggests that "it's very possible that the virus attaches to the kidney cells and attacks them,"[20] which would be especially devastating in an individual, like Mr. Salazar with a single kidney.  Recent statistics show that diabetes was the second most common comorbidity associated with COVID-19 deaths in New York, and renal disease was also a common comorbidity.[21]

### III. Conditions of Confinement and the Spread of COVID-19.

To combat transmission of the coronavirus, the CDC has issued guidance discouraging gatherings of more than ten people in one place.[22]  The CDC also urges social distancing: every person should remain at a distance of at least six feet from every other person.[23] On April 3, 2020, the CDC issued new guidance recommending that the general public "wear[] cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) especially in areas of significant community-based

---

[19] *Id.*

[20] *Id.*

[21] New York State Department of Health, Fatalities, available at https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (May 8, 2020).

[22] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[23] Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine

transmission." The Governor of Pennsylvania issued a similar advisory.[24]

Leaders across the globe have mobilized to drastically limit the physical interaction of people and the spread of the virus. For example, in Pennsylvania, where Mr. Salazar is located, Governor Wolf has enacted a stay-at-home order mandating that all individuals stay at home except for certain essential activities.[25]  These, and other, precautionary measures are designed specifically to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is so highly contagious. However, despite these measures, positive cases and corresponding deaths have grown exponentially: On April 1, 2020, Pennsylvania documented 5,805 COVID-19 cases statewide and confirmed 74 deaths.[26] Today Pennsylvania has 57,991 cases and confirmed 3,806 deaths.[27]

The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated prisoners or those who must interact with them. Congregate settings such as jails and prisons (as well as cruise ships, nursing homes, homeless shelters, and aircraft

---

[24] CDC, *Recommendations for Cloth Face Covers,* Apr. 3, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html. (Last accessed April 6, 2020). *See also* Gov. Wolf Calls for Universal Masking (Apr. 3, 2020) available at https://www.governor.pa.gov/newsroom/gov-wolf-calls-for-universal-masking/

[25] *See* Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/03.23.20-TWW-COVID-19-Stay-at-Home-Order.pdf. *See also* Order of the Secretary of the Pennsylvania Department of Health to Stay at Home, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/03.23.20-SOH-Stay-at-Home-Order.pdf

[26] *See Update: COVID-19 in Pennsylvania for Wednesday, April 1*, WNEP News, available at https://www.wnep.com/article/news/health/coronavirus/department-of-health-coronavirus-update-covid-19/523-4ec34146-3a57-4a28-9d54-4cc4188fedaa

[27] *See* Pennsylvania Department of Health*, COVID-19 Data for Pennsylvania,* https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited May 12, 2020).

carriers)[28] allow for the rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. Prisoners are confined in close proximity to one another and to the staff. Staff, by necessity, interact with each other and with prisoners when they enter a jail. Before arriving at work, they have interacted with their families, or they (or a family member) have been in public settings consistent with "shelter in place" orders and directives. When they report for their shifts, they may be unwitting carriers of COVID-19, introducing the virus into the prison and staff populations and environment. This creates a great number of opportunities for transmission among prisoners who must share the same air, dining halls, bathrooms, showers and other common areas. In addition, jails provide reduced opportunities to apply necessary hygiene measures, as they are often under-resourced and ill equipped.[29]

Simply stated, prisons are environments in which the COVID-19 virus can easily gain a foothold. When it does, it will spread rapidly, jeopardizing the life and safety of the prisoners, staff, family of staff, and the community as a whole. According to public health experts,

---

[28] *See, e.g.*, Nikita Stewart, "*It's a Time Bomb': 23 Dies as Virus Hits Packed Homeless Shelters*, New York Times (Apr. 13, 2020); Ariana MacNeill, *The 'Surprising" Number of Asymptomatic COVID-19 Cases In Boston's Homeless Shelters Has Advocates Scrambling*, Boston.com, (Apr. 16, 2020) https://www.boston.com/news/local-news/2020/04/16/boston-homeless-care-covid-19-update; *840 sailors on USS Theodore Roosevelt Test Positive for COVID-19, Navy say*s, USA Today (Apr. 24, 2020) available at https://www.usatoday.com/story/news/nation/2020/04/24/coronavirus-uss-theodore-roosevelt-sailors-test-covid-19-positive/3018331001/ ; Brakkton Booker, *Nearly 50 on USS Kidd Test Positive for Coronavirus, Navy Confirms*, NPR (Apr. 27, 2020) available at https://www.npr.org/sections/coronavirus-live-updates/2020/04/27/846377848/nearly-50-on-uss-kidd-test-positive-for-coronavirus-navy-confirms

[29] *See, e.g.* Joseph A. Brick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[30]

Moreover, coronavirus is especially difficult to contain, precisely because so many people may be asymptomatic carriers.[31] This makes the common methods used to detect illness in jail such as temperature screening largely ineffective. Low numbers of COVID-19 positive cases in jails and prisons reflect the reality that COVID-19 tests are not widely available, and that prisoners generally are only tested if they become seriously ill, and that other screening measures do not capture large numbers of cases. Two recent instances of testing and infection rates in incarcerative environments are illustrative on this issue. First, in Arkansas, after the first COVID-19 positive inmate case was discovered on April 10, 2020, officials tested all of the 47 inmates who were housed in the same barracks with the infected prisoner, and 44 of 47 tested positive despite not showing symptoms.[32] What's more, the Arkansas Department of Corrections stated that all of the inmates and staff had been equipped with personal protective gear (masks) *prior to the first positive case*. *Id*. Mass testing at a state prison in Ohio similarly and starkly

---

[30] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[31] *See also* Monica Gandhi, et. al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, New England J. of Medicine (Apr. 24, 2020) available at https://www.nejm.org/doi/full/10.1056/NEJMe2009758. See also CDC, Presymptomatic Transmission of SARS-CoV02 – Singapore, January 23- March 16, 2020, Morbidity and Mortality Weekly Report (Apr. 1, 2020) ("The evidence of presymptomatic transmission in Singapore, in combination with evidence from other studies . . . supports the likelihood that viral shedding can occur in the absence of symptoms and before symptom onset.") available at available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6914e1.htm?s_cid=mm6914e1_w

[32] Page Cushman, *44 Prisoners at Arkansas State Prison Test Positive for COVID-19; Deaths In State Up to 30*, KATV (Apr. 13, 2020) available at https://katv.com/news/local/43-prisoners-in-one-arkansas-prison-barrack-test-positive-for-covid-19.

revealed that 78% of all inmates tested were positive for COVID-19.[33]

Unsurprisingly, COVID-19 has spread like wildfire in federal prisons. The number of confirmed COVID-19 cases in BOP facilities has increased at a rate that is far faster than the rest of the country.[34] As of May 8, 2020, the BOP has confirmed 2,646 federal prisoners and 244 staff who have confirmed positive test results for COVID-19. In addition, 591 prisoners and 278 staff are listed as "recovered." There have been 44 federal prisoner deaths.[35] Even these numbers are likely a significant undercount. *See Order, Wilson v. Williams*, 20-cv-794, Dkt. No. 22, at 3 (N.D. Ohio Apr. 22, 2020) ("it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's prisoners").[36] The BOP's statistics are limited to confirmed coronavirus

---

[33]  Josiah Bates, *Ohio Began Mass Testing Incarcerated People for COVID-19. The Results Paint a Bleak Picture for the U.S. Prison System,* Time (Apr. 22, 2020) available at https://time.com/5825030/ohio-mass-testing-prisons-coronavirus-outbreaks/. *See also* Linda So & Grant Smith, *In Four U.S. state prisons, nearly 3,300 prisoners test positive for coronavirus – 96% without symptoms*, Reuters (Apr. 25, 2020) available at https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-prisoners-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX; see also Cary Aspinwall and Joseph Neff, *These Prisons are Doing Mass Testing for COVID-19 – And Finding Mass Infections*, The Marshall Project (Apr. 24, 2020) available at https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections?utm_source=The+Marshall+Project+Newsletter&utm_campaign=aa581d2c1c-EMAIL_CAMPAIGN_2020_04_25_11_44&utm_medium=email&utm_term=0_5e02cdad9d-aa581d2c1c-174299869.

[34] Percentage of Increase of Infected BOP People (Prisoner and Staff) since 3/20/2020, Federal Defenders of New York (Apr. 27, 2020), https://federaldefendersny.org/.

[35] *See* Federal Bureau of Prisons, COVID-19, available at https://www.bop.gov/coronavirus/ (last visited May 8, 2020). An additional 110 prisoners at privately managed institutions have lab-confirmed positives. There are currently no positives listed at CI Moshannon. *See* https://www.bop.gov/coronavirus/docs/private_prisons_COVID_data.pdf (last visited May 8, 2020).

[36] FCI Elkton is instructive here. Like Moshannon Valley CI, it is also located in a rural area. However, once the virus gained a foothold inside the Elkton it spread widely, due in part to the dormitory-style housing.

cases, not those are symptomatic and in isolation. The following charts help visualize the extent of the crisis in BOP facilities as of today:





In a letter to Department of Justice Inspector General Michael Horowitz, who opened an investigation into the BOP's handling of COVID-19, Senators Durbin and Grassley conveyed their concerns "that the BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because BOP has not yet conducted the number of tests on staff or prisoners appropriate for facilities where a highly contagious virus can be easily spread.[37] They further

---

[37] Letter from Senators Durbin & Grassley to Inspector General Michael Horowitz (Apr. 21,

asked IG Horowitz to investigate whether BOP's official reporting "has accurately and adequately informed Congress and the public on the scope of the threat and the authorities and resources needed to combat it."

Notably, while the country focuses on the rapidly unfolding crisis at federal prisons in Elkton, Danbury, Terminal Island, Oakdale, Fort Worth, and Butner, where numerous people are already sick and dead or dying, those prisons themselves were not on the radar for coronavirus outbreaks just two weeks earlier.[38] It is only a matter of time before the virus explodes in other facilities. Because it is not yet known where or when that will happen, waiting until the virus hits a facility hard is untenable and unconscionable, because by then it will be too late for the most vulnerable prisoners like Mr. Salazar. Consider that in the Cook County Jail, the first corrections officer did not test positive until March 22, 2020 and the first detainee did not test positive until March 23, but less than just two weeks later, 221 detainees and 70 staffers had tested positive.[39] Even if COVID-19 has not already arrived at CI Moshannon, it is likely to hit soon. Once it does, the dormitory-style living and lack of ability to social distance will provide no protection for medically vulnerable and elderly prisoners like Mr. Salazar.

---

2020),
 https://www.durbin.senate.gov/newsroom/press-releases/durbin-grassley-press-doj-ig-to-review-implementation-of-first-step-act-and-cares-act-in-bop-covid-19-investigation

[38] See, e.g., Sadie Gurman, et al., *Coronavirus Puts a Prison Under Siege*, Wall Street Journal, Apr. 6, 2020, https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-deathsentences- 11586191030 (noting the sudden spread of the disease at Elkton).

[39] Tyler Kendall, "We're at War with No Weapons": Coronavirus Cases Surge Inside Chicago's Cook County Jail, CBS News (Apr. 5, 2020), https://www.cbsnews.com/news/chicago-cook-county-jailcoronavirus-life-inside-covid-19-cases/

## ARGUMENT

This Court can and should act quickly to release Mr. Salazar. His age and medical conditions put him at high risk for death or serious complications from COVID-19. With only six months remaining on his sentence, the sentencing goals of just punishment and deterrence have been achieved. Compassionate release of Mr. Salazar would pose no danger to the public, as it would merely permit him to be released to immigration authorities and be deported to his home in Colombia. This is the safest option not just for him, but also for the other prisoners and correctional officers at CI Moshannon Valley.

The First Step Act empowered this Court to make an independent determination as to whether there are "extraordinary and compelling reasons" for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A). Prior to 2018, only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate-release motions." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).[40] In reality, the BOP rarely filed for relief on behalf of prisoners. Although the BOP was first authorized to file compassionate-release motions in 1984, an average of only 24 prisoners were released each year through BOP-filed motions from 1984 to 2013.[41] Against this backdrop, the First Step Act was enacted in 2018, and is a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to

---

[40] The Comprehensive Crime Control Act of 1984 first included the so-called "compassionate release statute" which allowed for a district court to modify a final term of imprisonment after finding the existence of "extraordinary and compelling reasons" only upon motion by the Director of the Bureau of Prisons ("BOP"). 18 U.S.C. § 3582(c)(1)(A)(i); *see also* P.L. 98-473, 98 Stat 1837 (Oct. 12, 1984). Without such motion, district courts were unable to reduce a prisoner's sentence, even if it concluded that extraordinary and compelling reasons existed to do so. The BOP served as a gatekeeper to a prisoner's road to potential relief and limited the sentencing court's jurisdiction.

[41] *See* Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice), available at: https://oig.justice.gov/testimony/t160217.pdf

promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 411 F.

Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview*

1 (2019)). In an effort to improve and increase the use of the compassionate-release process, the

First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for

compassionate release, removing the BOP's exclusive "gatekeeper" role.[42] Section §

3582(c)(1)(A) now authorizes courts to modify an otherwise-final term of imprisonment, in

relevant part, "upon motion of the defendant after [she] has fully exhausted all administrative

rights . . . or the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility, whichever is earlier," if it is consistent with the § 3553(a) factors and the

Sentencing Commission's policy statements. § 3582(c)(1)(A), § 3582(c)(1)(A)(ii).

      Mr. Salazar is eligible for compassionate release as his medical vulnerabilities and

advanced age present "extraordinary and compelling reasons." As a 76-year-old man with

diabetes, asthma, and only one kidney, continued incarceration would place Mr. Salazar at an

unacceptable risk of death or serious injury. Second, in light of the danger posed by this

pandemic, an order reducing Mr. Salazar's sentence to time served would best achieve

§3553(a)'s directive to impose a sentence that is "sufficient but not greater than necessary."

Finally, on April 10, 2020, the warden at CI Moshannon received Mr. Salazar most recent

request for compassionate release, and 30 days have elapsed since that time. Thus, this Court

may entertain the merits of Mr. Salazar's motion.

---

[42] *See also United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

I.      **Extraordinary and Compelling Reasons Exist to Grant Compassionate Release and Reduce Mr. Salazar's Sentence.**

The COVID-19 pandemic combined with Mr. Salazar's potential vulnerability due to his age and medical conditions are "extraordinary and compelling" reasons to reduce Mr. Salazar's sentence, and permit him to be transferred to immigration authorities. Numerous courts have found that the combination of the COVID-19 pandemic and a defendant's debilitating or high-risk health conditions and comorbidities constitute "extraordinary and compelling" reasons for compassionate release. *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (prisoner's diabetes, high blood pressure and liver abnormalities constituted "compelling reasons," despite the fact that the BOP classified him at the lowest care level and that the government argued that his conditions were not unusual: "In the absence of a deadly pandemic that is deadlier to those with [the defendant's] underlying conditions, these conditions would not constitute 'extraordinary and compelling reasons.' It is the confluence of COVID-19 and [the defendant's] health conditions that makes this circumstance extraordinary and compelling."); *United States v. Zuckerman*, 2020 WL 1659880 at *5 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release to 75 year-old prisoner with diabetes, hypertension and obesity who was housed at FCI-Otisville in dormitory-style housing); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (granting compassionate release to 31 year-old defendant suffering from diabetes, severe obesity and hypertension); *United States v. Saad*, 2020 WL 2251808 (E.D. Mich. May 5, 2020) (granting compassionate release to 71 year- old defendant with chronic kidney disease, diabetes, hypertension and other medical conditions); *United States v. Gorai*, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) (granting compassionate release to a 34-year-old defendant with asthma as the only identified medical condition); *United States v. Smith*, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (finding age and medical conditions "such as asthma— place him at a higher risk" and granting release).

Courts have found "extraordinary and compelling" circumstances even when there are not yet any COVID-19 positive cases within a defendant's particular institution or BOP facility. *See, e.g., United States v. Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (granting compassionate release to 65 year-old prisoner with diabetes and end-stage liver disease who was housed at FMC-Devens prior to any positive cases); *United States v. Muniz,* 2020 WL 1540325 (Mar. 30, 2020) (granting compassionate release to prisoner with end stage renal disease, diabetes, and arterial hypertension housed at FCI-Butner prior to any positive cases); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (granting compassionate release to 45 year old defendant with Type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea, and asthma, despite the fact that there are currently no confirmed cases of COVID-19 at FCI-Loretto); *United States v. Pabon*, 2020 WL 2112265 (E.D. Pa. May 4, 2020) (reducing 46 month sentence to 14 months for 54 year-old prisoner with diabetes, hypertension, hemophilia and other ailments, despite the fact that there are currently no confirmed cases of COVID-19 at Lewisburg Camp). As the Court noted in *Amarrah*, "[z]ero confirmed COVID-19 cases is not the same thing as zero COVID-19 cases . . . This disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a lack of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of prisoners and staff." *Amarrah*, 2020 WL 2220008 at *6.

As a non-citizen of the United States, Mr. Salazar is not eligible for home confinement under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020). The fact that – but for his immigration status – Mr. Salazar may have otherwise been granted home confinement should weigh toward a finding of compassionate release and warrant a reduction in his sentence. *See, e.g., United States v. Guzman Soto*, 2020 WL 2104787 at *3 (D. Mass. May 1, 2020) (observing that "the Attorney General, in

giving direction to the Director of the Bureau of Prisons, has recognized that COVID-19 is an extraordinary and compelling factor which may be considered, alongside other factors, when determining whether home confinement is merited for certain prisoners. Here, where [defendant] may have been granted home confinement but for his immigration status, the court finds that compassionate release is appropriate because of the extraordinary and compelling danger posed by COVID-19."). Notably, although Mr. Salazar is to be deported to his native Colombia, he was paroled into the United States for the express and sole purpose of facing prosecution and accepting punishment for this offense.

## II.     A Reduction in Sentence is Warranted Under the Section 3553(a) Factors.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, a reduction sentence to time served is warranted under the § 3553(a) factors. Prior to the instant offense, Mr. Salazar had no criminal record. He was designated Criminal History Category I. He was cooperative with the United States government regarding appearing before this Court and pleading guilty to an information. He has served the vast majority of his 50-month sentence and is currently scheduled for release in six months, on November 20, 2020.[43] Due to the specific nature of the case and Mr. Salazar's advanced age and medical conditions, the risk of recidivism is very low, and his imminent deportation assuages any concerns regarding danger to the public in the United States. The Sentencing Commission's own data reflect "[r]ecidivism rates decline relatively consistently as age increases," with the lowest rates for offenders

---

[43] *See* Bureau of Prisons Inmate Locator, results for Pedro Mejia Salazar, Register No. 00229-138, https://www.bop.gov/inmateloc/ (last accessed May 12, 2020) (listing an anticipated release date of November 20, 2020).

aged 50 and older.[44] U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12.

Although a 50-month sentence, when imposed in May 2017, was sufficient but not greater than necessary at that time, the calculus for that determination changes in the face of a pandemic – and Mr. Salazar's continued imprisonment places him at acute and serious risk of getting sick and dying from the virus. In the age of COVID-19, "sufficient but not greater than necessary" takes on new meaning, and particular significance, for vulnerable at-risk inmates. That is, "[t]o avoid a sentence that *was* sufficient but no greater than necessary from becoming one immeasurably greater than necessary," the compassionate release of vulnerable, low security inmates like Mr. Salazar is appropriate. *United States v. Park*, 2020 WL 1970603 at *5 (S.D.N.Y. Apr. 24, 2020) (emphasis added) (internal citation omitted). *Accord United States v. Mel*, 2020 WL 2041674 at *3 (D.Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."). Although the court was aware of his age and medical issues at the time of sentencing, he is at acute and specific risk of contracting COVID-19, of suffering severe illness and complications, and of succumbing to the disease altogether if he gets sick.

Here, a reduction or modification of Mr. Salazar's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. Given the COVID-19 pandemic, the service of most of his sentence now adequately reflects the seriousness of his offense and has provided just punishment. 18 U.S.C. § 3553(a)(2)(A). *See, e.g., United States v. Rodriguez*, 2020 WL 1627331 at *11 (E.D. Pa. Apr. 1, 2020) (at-risk inmate's

---

[44] U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

service of all but three years of his sentence – "most of the original sentence imposed" – was "long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes").

At the termination of his sentence, he is to be deported to his native Colombia, where he can be cared for by family, adequately socially distance, and avoid the heightened risks that are attendant to imprisonment. Mr. Salazar had – and still has – a stable home to which he can return in Colombia. Undersigned counsel spoke to his daughter by phone before filing this motion and confirmed that is still the case. His daughter, Maria Mejia, informed undersigned counsel that their family would be both happy *and* relieved to have him return home to Colombia so that they can care for him. There is no question that Mr. Salazar will be safer at home with his family, where he can take greater measures to socially distance that simply are not possible in the dormitory prison at Moshannon Valley. § (3553(a)(2)(D); *see also United States v. Scparta,* 2020 WL 1910481 at *8 (S.D.N.Y. Apr. 20, 2020) ("due to the COVID-19 pandemic, the "history and characteristics of the defendant" and the "need ... to provide the defendant with needed ... medical care," § 3553(a), now weigh heavily in favor of Mr. Scparta's release, given the health risk that continued incarceration poses to him."). For these reasons, a sentencing reduction is warranted under § 3553(a).

### III. Mr. Salazar's release is consistent with U.S.S.G. § 1B1.13, to the limited and non-binding extent it applies.

The Sentencing Commission, at the direction of Congress, set forth three specific categories qualifying as extraordinary and compelling: terminal medical conditions, medical debilitation, and family circumstances. U.S.S.G. § 1B.13 cmt.1(A)–(C). Recognizing these categories might not encompass the wide range of compelling reasons, however, the Commission added a catch-all—"other reasons"—which may act "in combination" with the

prior categories or might be wholly independent. See U.S.S.G. § 1B1.13 cmt.1(D). *See also*

*United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that

§1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, 2019

WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes

suggest a flexible approach . . . [and] recognize that the examples listed in the application

note do not capture all extraordinary and compelling circumstances."). Moreover, the

Commission's policy statement regarding sentence reductions, as laid out in § 1B1.13, has

not been updated in the year and a half since § 3582(c)(1)(A) was amended in 2018. As

such, the Commission's existing policy statement addresses only the pre-First Step Act

version of § 3582(c)(1)(A) and speaks only to conditions under which a reduction is

appropriate under the more restrictive criteria – i.e., a motion brought by the BOP where the

defendant is "suffering from a terminal illness," or "experiencing a serious deterioration in

physical or mental health because of the aging process." § 1B1.13(A)-(B). Accordingly,

there is no policy statement of the Commission addressing motions (like the instant motion)

brought by a defendant on the grounds of high risk of severe illness and/or death as a result

of COVID-19. See, e.g., *United States v. Redd*, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16,

2020) ("there does not currently exist, for the purposes of satisfying the First Step Act's

'consistency' requirement, an 'applicable policy statement.'"), & n.11 (collecting cases).

The majority of districts, therefore, have held that—since the FSA's passage—section

1B1.13 is not binding but is, rather, helpful guidance." *United States v. Almontes*, 2020 WL

1812713, at *3 (D. Conn. Apr. 9, 2020) (collecting cases).

    Nonetheless, this Court has discretion to assess whether Mr. Salazar presents

"extraordinary and compelling reasons" for his release outside those listed in the non-

exclusive criteria of subsections (A)-(C) of the pre-First Step Act policy statement. *See*

Memorandum, *United States v. Jeremy Rodriguez*, 03-cr-00271-AB-1 (E.D.P.A. Apr. 1,

2020), at 12 (granting compassionate release due to COVID-19 and holding that the Court

had discretion to assess whether the defendant presented "extraordinary and compelling

reasons" for his release outside of those listed in the non-exclusive criteria of subsections

(A)-(C) of the policy statement.").[45] In *United States v. Guzman-Soto*, the District Court for

the District of Massachusetts – in granting compassionate release for a defendant with

hypertension – noted that the "Commission's policy statement includes a catch-all provision

that allows for compassionate release when 'there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with' the other

enumerated reasons. 2020 WL 2104787, at *3 (D. Mass. May 1, 2020). Moreover, "the

Attorney General, in giving direction to the Director of the Bureau of Prisons, has

recognized that COVID-19 is an extraordinary and compelling factor which may be

considered." *Id.* at *3.

Indeed, many districts have found that the heightened risk of contracting this highly

contagious and – for defendants like Mr. Salazar – deadly disease are extraordinarily and

compelling reasons under both § 3582(c)(1)(A) and § 1B1.13. *See e.g. United States v.

McCarthy*, 2020 WL 1698732 at *5 (D. Conn. Apr. 8, 2020) ("Defendant has demonstrated

extraordinary and compelling reasons justifying his release under section 3582(c)(1)(A) and

section 1B1.13 of the Sentencing Guidelines [where his conditions] substantially increase

his risk of severe illness if he contracts COVID-19."); *United States v. Zukerman*, 2020 WL

1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (finding "'extraordinary and compelling reasons' to

---

[45] Application Note 1 to § 1B1.13 defines "extraordinary and compelling reasons," in relevant
part, as encompassing "other reasons" beyond those the Commission has expressly enumerated –
that is, where "there exists in the defendant's case an extraordinary and compelling reason *other
than, or in combination with,* the reasons described in subdivisions (A) through (C)." (emphasis
added).

modify his sentence [under] 18 U.S.C. § 3582(c)(1)(A)(i), because of the great risk that COVID-19 poses to an elderly person with underlying health problems"); *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding "extraordinary and compelling reasons justifying ... immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" where defendant['s] medical condition [] substantially increases her risk of severe illness if she contracts COVID-19"); *United States v. Jepsen*, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting compassionate release to defendant who[se] multiple chronic conditions . . . predispose him to potentially lethal complications if he contracts COVID-19"); *United States v. Campagna*, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release where defendant's conditions, "taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence"); and *Guzman Soto,* supra at *3 ("compassionate release is appropriate because of the extraordinary and compelling danger posed by COVID-19."). Thus, compassionate release, and a reduction in sentence, for Mr. Salazar is consistent with the Sentencing Commission's policy statement laid out in U.S.S.G. § 1B1.13, and is supported by extraordinary and compelling reasons, as described herein.

### IV.   Mr. Salazar Exhausted his Administrative Remedies.

Mr. Salazar filed his renewed petition for compassionate release with the warden on April 5, 2020. The warden received it on April 10, 2020, and denied it on April 14, 2020. *See* Exh. B. Under section 3582(c)(1)(A) the Court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier. . ." (emphasis added). Here,

because the warden received and denied Mr. Salazar's inmate request, and because 30 days have since lapsed from the time the warden received the request on April 10, 2020, Mr. Salazar has exhausted his administrative remedies and his motion for compassionate release is properly before the court. *See e.g., United States v. Miamen*, 2020 WL 1904490 at *3 (D.R.I. Apr. 17, 2020) (denying request because defendant did not wait 30 days but noting that "if the BOP denies Defendant's request, or 30 days lapse, whichever occurs first *see* 18 U.S.C. § 3582(c)(1)(A), Defendant is free to file again his Motion before this Court."). As 30 days have elapsed from the receipt of Mr. Salazar's request on April 10, it is not necessary that Mr. Salazar appeal the denial of compassionate release in order to file in this Court. *See, e.g., United States v. Joling*, No. 6:11-cr-60131, 2020 WL 1903280, at *2 (D. Oregon April 17, 2020) (quoting *Brown v. United States*, 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019) ("Exhaustion occurs when the BOP denies a defendant's application or lets thirty days pass without responding to it."). Moreover, an appeal in this instance would be futile, as his immigration status would prevent the BOP from granting compassionate release in this instance. *See* Exh. B (listing an ICE detainer as one of the reasons Mr. Salazar would be ineligible for release).

Finally, although as of the filing of this motion, 30 days has passed since Mr. Salazar sought compassionate release, to the extent the Court finds he has not exhausted administrative remedies, the Court can dispense with the administrative exhaustion requirement where, as here, there are "exceptional circumstances of peculiar urgency . . . ." *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (internal quotations omitted). When a defendant is facing irreparable harm if exhaustion is required, courts have waived exhaustion of administrative remedies.[46] The First Step Act did not alter this precedent.

---

[46] *See, e.g., Garza v. Davis,* 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility

Both the administrative exhaustion procedure and the circumstances meriting its waiver remain unchanged.  District courts continue to waive the administrative exhaustion requirements under the First Step Act where circumstances warrant doing so. *See*, *e.g.,* *Thody v. Swain*, 2019 WL 7842560, *2 (C.D. Cal. Nov. 26, 2019) ("A district court may, in its discretion, excuse the failure to exhaust if exhaustion would be futile," but finding the petitioners "conclusory allegations" to be insufficient to establish futility); *Merth v. Puentes*, No.1:19-cv-00251, 2019 WL 3003684, *3 (C.D. Cal. July 10, 2019) ("As Respondent did 'not have the authority to grant any provision of the First Step Act without guidance from the Bureau of Prisons' . . . pursuing administrative remedies would have been futile. Accordingly, exhaustion can be waived.").

The COVID-19 pandemic, and the particularized and heightened risk faced by certain defendants, are the very circumstances in which courts have found waiver of administrative exhaustion requirements appropriate. *See, e.g., United States v. Guzman-Soto*, 2020 WL 1905323 (D. Mass. Apr. 17, 2020) (concluding the court may exercise discretion to consider defendant's motion without waiting 30 days); *United States v. Zukerman*, No. 16-CR-194, 2020 WL 1659880,at *4 (S.D.N.Y. April 3, 2020) ("[T]he Court holds that [defendant]'s advanced age and compromised health, combined with the high risk of contracting COVID-19 at Otisville, justify waiver of the exhaustion requirement."). Therefore, even though Mr. Salazar contends he has satisfied exhaustion under the First Step Act, to the extent to the Court finds them not exhausted, the Court should so waive them to

---

exception in context of 28 U.S.C. § 2241 petition); *Elwood v. Jeter*, 386 F.3d 842, 844 n.1 (8th Cir. 2004) (same); *Boucher v. LaManna*, 90 F. Supp. 2d 883, 887 (N.D. Ohio 2000) (concluding exhaustion was futile where the BOP's policy on categorizing inmate's offense as violent crime was mandatory and potential for immediate release counseled timely consideration of petitioner's case).

prevent irreparable harm to Mr. Salazar.

## CONCLUSION

For the foregoing reasons, Mr. Salazar respectfully requests that the Court grant a reduction in his sentence to time served to allow him to be released to immigration authorities and be deported to his home in Colombia.

Respectfully submitted,

PEDRO MEJIA SALAZAR
By His Attorney,

*/s/ Sandra Gant*
Sandra Gant
BBO # 680122
Federal Public Defender Office
**Temporary Mailing Address:**
P.O. Box  51268
Boston MA 02205
**Physical Address:**
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 12, 2020.

*/s/ Sandra Gant*
Sandra Gant